

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
07/19/2019

| | | |
|---|---|---|
| In re: | § § | Case No. 17-30338 |
| **DANNY HANNA,** | § § | **Chapter 7** |
| Debtor. | § § | |

| | | |
|---|---|---|
| **DMM Group, Inc.,** | § § § | |
| Plaintiffs, | § § | **Adversary No. 17-03240** |
| v. | § § | |
| **DANNY HANNA,** | § § | |
| Defendant. | § § | |

**MEMORANDUM OPINION REGARDING PLAINTIFF DMM GROUP, INC.'S**
**COMPLAINT FOR DETERMINATION THAT DEBT IS NONDISCHARGEABLE**
[Adv. Doc. No. 1]

## I. INTRODUCTION

Danny Hanna ("the **Debtor**") filed a Chapter 13 petition on January 23, 2017 ("the **Petition Date**") [Main Case Doc. No. 1].  On May 9, 2017, DMM Group, Inc. ("**DMM**") initiated the pending adversary proceeding against the Debtor [Adv. Doc. No. 1].  Prior to the Debtor's filing of his Chapter 13 petition, DMM extended a loan of $150,000.00 to the Debtor's 100%-owned company, a debt that the Debtor personally guaranteed.  DMM requests this Court to enter a judgment for the amount of the unpaid loan, plus attorneys' fees and costs, as a nondischargeable debt for which the Debtor is liable under 11 U.S.C. § 523(a)(2)(A).[1]

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and any reference to any section refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted. Further, any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure.

The Court held a one-day trial in this adversary proceeding on May 29, 2019.  The Court then took the matter under advisement.  On July 1, 2019, this Court held a brief hearing to announce orally on the record that it had decided to grant the relief sought by DMM.  The Court indicated that it would eventually issue written Findings of Fact and Conclusions of Law, together with a judgment, explaining its decision.  However, the Court informed the parties that it would refrain from entering its written findings and conclusions, plus the judgment, until after DMM had proven up its reasonable attorneys' fees and costs.  The Court instructed DMM's counsel to submit his fee bills to counsel for the Debtor by no later than noon on July 3, 2019, and also instructed the Debtor's counsel to file a certificate by no later than 5:00 p.m. on July 10, 2019 setting forth whether the Debtor objected to the amount of the fees and expenses requested by DMM. The Court further stated that if, and only if, the Debtor filed an objection would this Court hold a separate evidentiary hearing requiring DMM to prove up its reasonable attorneys' fees and expenses.

DMM's counsel did, in fact, timely submit his firm's fee bills, which reflect that the DMM's fees and expenses total $19,031.79. [Adv. Doc. No. 42].  The deadline of July 10, 2019 for the Debtor to file a certificate objecting to this amount has expired, and the Debtor has lodged no objection.  Accordingly, the Court finds that the Debtor agrees that the amount of $19,031.79 is a reasonable amount for DMM to recover from the Debtor.[2]

Now that the issue of reasonable attorneys' fees and expenses has been determined, the Court proceeds to issue these written Findings of Fact and Conclusions of Law pursuant to Rule 7052 explaining why it has decided to grant the relief requested by DMM and enter a judgment

---

[2] Even though the Debtor lodged no objection, counsel for DMM appeared in court on July 15, 2019, and made a record (introducing three exhibits—36, 37, and 38—and giving testimony himself) in support of the fee and expense request of $19,031.79.  The Court made findings of fact and conclusions of law on the record and approved this amount.  Finally, the Court reiterates what it stated on the record at the July 1, 2019 hearing: namely, that the Debtor's decision not to object to the reasonableness of DMM's fees and expenses in no way constitutes any waiver of the Debtor's right to appeal the judgment that this Court is entering that the Debtor is liable to DMM for the nondischargeable amount of $219,535.47, which figure includes attorneys' fees and expenses of $19,031.79.

declaring that $219,535.47, the outstanding amount owed under the loan documents (including unpaid principal, accrued unpaid interest, attorneys' fees and expenses) is a nondischargeable obligation owed by the Debtor. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves the right to make additional findings and conclusions as this Court deems appropriate or as may be requested by either of the parties.

## II.   FINDINGS OF FACT

1. The Debtor is a former principal of Blackwolf Security Group, LLC ("**Blackwolf**"). Blackwolf's headquarters was in the Woodlands, Texas, and it was in the security business—i.e. providing security to various corporations and organizations. [Tape Recording, May 29, 2019, Tr. at 10:17:24 – 10:17:35 a.m., 2:53:38 – 2:54:14 p.m.].

2. DMM is owned entirely by Dale Mohn ("**Mohn**"). [Tape Recording, May 29, 2019, Tr. at 1:47:54 – 1:48:06 p.m.]. Mohn is the sole decision-maker for DMM, whose business involves security consulting and making investments, which includes extending loans. [Tape Recording, May 29, 2019, Tr. at 1:47:54 – 1:48:06 p.m., 1:49:28 – 1:49:32 p.m., 2:20:22 – 2:20:46 p.m.].

3. Patrick Magill ("**Magill**") is an accountant who has referred business to DMM in the past. [Tape Recording, May 29, 2019, Tr. at 1:49:25 – 1:49:42 p.m.].

4. Magill also provided accounting services to Blackwolf. [Tape Recording, May 29, 2019, Tr. at 1:49:42 – 1:49:54 p.m.].

5. Magill suggested to Mohn that DMM might want to provide financing to Blackwolf, and a meeting was subsequently arranged. [Tape Recording, May 29, 2019, Tr. at 1:49:35 – 1:49:42 p.m.].

6.  In early June of 2016, Mohn met with the Debtor, Magill, and Catherine Carriger ("**Carriger**").  [Tape Recording, May 29, 2019, Tr. at 1:48:46 – 1:49:03 p.m.].  The purpose of the meeting was to introduce the parties and to discuss a possible loan from DMM to Blackwolf.  [Tape Recording, May 29, 2019, Tr. at 1:49:03 – 1:49:42 p.m.].  At this meeting, Mohn met the Debtor and Carriger for the first time.  The Debtor informed Mohn that Carriger was in the process of obtaining a security permit and setting up her own minority-owned company in Dallas—Blackwolf SG, LLC ("**SG**")—to maximize the potential of securing a large contract with the U.S. Department of Labor.  [Tape Recording, May 29, 2019, Tr. at 2:54:48 – 2:55:07 p.m.].

7.  This meeting lasted approximately ninety minutes.  [Tape Recording, May 29, 2019, Tr. at 1:52:03 – 1:52:08 p.m.].  The Debtor did much of the speaking and expressly represented to Mohn that Blackwolf was expanding its operations with a Dallas office and was planning to start a training business in Dallas.  [Joint Pretrial Statement, Adv. Doc. No. 35, Stipulated Fact Nos. 12b and 12g, page 7 of 13].  The Debtor further represented to Mohn that Blackwolf and SG needed a $150,000.00 loan to expand their respective businesses in Dallas.  [Tape Recording, May 29, 2019, Tr. at 1:50:41 – 1:51:17 p.m.].  Indeed, the Debtor expressly told Mohn that if DMM would extend financing of $150,000.00, all of the loan proceeds would be used solely to expand business operations in Dallas and that no loan proceeds would be used to pay Hanna or Carriger or for any non-business related purpose.  [Tape Recording, May 29, 2019, Tr. at 2:00:10 – 2:00:50 p.m.]; [Joint Pretrial Statement, Adv. Doc. No. 35, Stipulated Fact No. 12a, page 7 of 13].  The Debtor also informed Mohn that Blackwolf anticipated an increase in profits of approximately fifteen percent given the business in its pipeline.  [Joint Pretrial Statement, Adv. Doc. No. 35, Stipulated Fact No.

12e, page 7 of 13]. The Debtor also reviewed Blackwolf's balance sheet in order to acquaint Mohn with Blackwolf's financial condition at the time. [Tape Recording, May 29, 2019, Tr. at 1:50:17 – 1:50:27 p.m.]. However, the Debtor did not allow Mohn to take a copy of this balance sheet with him once the meeting adjourned because Mohn had not signed a non-disclosure agreement. [Tape Recording, May 29, 2019, Tr. at 1:50:25 – 1:50:32 p.m., 2:22:30 – 2:23:07 p.m.]. Based upon the financial statements that Mohn reviewed during the meeting, he tentatively concluded that Blackwolf and SG were viable operating entities to which DMM might extend financing. [Tape Recording, May 29, 2019, Tr. at 2:24:00 – 2:24:07 p.m.]. At this initial meeting, Mohn also asked some questions about Blackwolf, including whether the company was involved in any legal proceedings at the time. [Tape Recording, May 29, 2019, Tr. at 1:51:26 – 1:51:38 p.m.]. The Debtor responded that it was not—which was a truthful statement at that time. [Tape Recording, May 29, 2019, Tr. at 1:51:38 – 1:51:43 p.m.]. When the meeting was concluded, Mohn made no decision to provide the requested financing. [Tape Recording, May 29, 2019, Tr. at 1:51:18 – 1:51:25 p.m.].

8. In late August of 2016, the Debtor and Mohn met again to discuss the possibility of DMM extending a loan to Blackwolf and SG. [Tape Recording, May 29, 2019, Tr. at 1:52:29 – 1:52:41 p.m.]. Mohn also met Matt Antkowiak ("**Antkowiak**") at this meeting. [Tape Recording, May 29, 2019, Tr. at 2:27:40 – 2:27:57 p.m.]. Antkowiak was Blackwolf's quality manager, compliance officer, and operations manager who would be responsible for opening and running Blackwolf's Dallas office and obtaining contracts with the Department of Labor. [Tape Recording, May 29, 2019, Tr. at 10:18:49 – 10:19:16 a.m., 10:45:56 – 10:46:18 a.m., 2:28:00 – 2:28:17 p.m.]. Paul Cherry ("**Cherry**"), a CPA and

colleague of Magill, also attended this meeting. [Tape Recording, May 29, 2019, Tr. at 1:52:29 – 1:52:53 p.m.]. When the meeting was concluded, Mohn decided to provide the requested financing. [Tape Recording, May 29, 2019, Tr. at 2:31:44 – 2:31:57 p.m.].

9.  On or about August 22, 2016, Blackwolf's account at Spirit of Texas Bank was frozen and the Spirit of Texas Bank commenced legal proceedings against Blackwolf, the Debtor, and Carriger. [Plaintiff's Ex. 28, BS 117-127]. This lawsuit was styled: Cause No. 2016-56225, *Spirit of Texas Bank SSB v. Blackwolf Security Group LLC, Danny B. Hanna, and Catherine G. Carriger*, in the 113th Judicial District Court, Harris County, Texas ("the **State Court Lawsuit**"). [Plaintiff's Ex. 28, BS 117-127]. The Debtor did not disclose these facts to Mohn at this time. [Tape Recording, May 29, 2019, Tr. at 11:00:08 – 11:00:27 a.m.].

10. On or about August 30, 2016, Blackwolf failed to make scheduled payroll to its employees. [Tape Recording, May 29, 2019, Tr. at 10:36:20 – 10:36:31 a.m.]. The Debtor did not disclose this fact to Mohn at this time. [Tape Recording, May 29, 2019, Tr. at 10:35:10 – 10:35:30 a.m.].

11. At this point in time, the Debtor became very concerned about the continued viability of Blackwolf. [Tape Recording, May 29, 2019, Tr. at 11:08:18 – 11:08:23 a.m.]. Indeed, at trial, the Debtor testified that at this point, Blackwolf was in "survival mode"—as opposed to the "expansion mode" frame of mind that he had conveyed to Mohn at the meeting in June. [Tape Recording, May 29, 2019, Tr. at 11:08:18 – 11:08:23 a.m.]. The Debtor did not inform Mohn about Blackwolf's failure to make scheduled payroll or about the Debtor's view that Blackwolf was in "survival mode." [Tape Recording, May 29, 2019, Tr. at 11:08:51 – 11:09:32 a.m., 2:02:58 – 2:03:08 p.m.]. As already noted in Finding of

Fact No. 9, at some point after the meeting among the Debtor, Antkowiak, Cherry, and Mohn in late August of 2016, Mohn, on behalf of DMM, and in reliance upon the Debtor's representations that Blackwolf would use loan proceeds solely to fund expansion in Dallas, made the decision to provide a $150,000.00 loan to Blackwolf and SG to fund their Dallas expansion. [Tape Recording, May 29, 2019, Tr. at 2:01:50 – 2:01:56 p.m.]. Mohn decided that DMM would provide the financing without doing any further due diligence or requesting any further financial statements from Blackwolf and SG. [Tape Recording, May 29, 2019, Tr. at 2:26:38 – 2:27:00 p.m.]. Mohn insisted, however, that the Debtor and Carriger personally guarantee the loan. [Tape Recording, May 29, 2019, Tr. at 1:57:06 – 1:57:30 p.m.]; [*see* Plaintiff's Ex. 2, BS 005-013]. Accordingly, on September 28, 2016, Blackwolf and SG, through their respective managing members (i.e. the Debtor and Carriger) executed that one certain promissory note in the original principal amount of $150,000.00 payable to DMM ("the **Note**"); and the Debtor and Carriger, in their individual capacities, executed a guaranty agreement ("the **Guaranty**") guaranteeing payment of the Note. [Joint Pretrial Statement, Adv. Doc. No. 35, Stipulated Fact No. 4, page 6 of 13]. The Note and the Guaranty were unsecured obligations; DMM did not take a security interest in any assets. [*See* Plaintiff's Ex. 1, BS 001-004; Plaintiff's Ex. 2, BS 005-015]. The Note expressly required that Blackwolf provide notice of any litigation or dispute threatened against or affecting Blackwolf. [Plaintiff's Ex. 1, BS 002]. Despite this language, the Debtor never disclosed to Mohn the existence of the State Court Lawsuit. [Tape Recording, May 29, 2019, Tr. at 2:01:58 – 2:02:10 p.m., 2:02:35 – 2:02:49 p.m.].

12. Upon execution of the Note and the Guaranty, DMM delivered a check for $150,000.00 to Blackwolf. [Tape Recording, May 29, 2019, Tr. at 10:23:15 – 10:23:43 a.m., 11:54:02 –

11:54:38 a.m.]; [Joint Pretrial Statement, Adv. Doc. No. 35, Stipulated Fact No. 6, page 6 of 13]. This check was deposited into Blackwolf's operating account at Cadence Bank on September 30, 2016. [Plaintiff's Ex. 14, BS 059]. As of the close of business on September 30, 2016, the balance in Blackwolf's account was $186,234.78. [Plaintiff's Ex. 15, BS 071]. Stated differently, just prior to the deposit of the $150,000.00 of loan proceeds, Blackwolf had $36,234.78 of cash on hand. [*See* Plaintiff's Ex. 15, BS 071].

13. Upon receipt of the $150,000.00, Blackwolf very quickly used approximately $36,684.25 to pay past due payroll, and another $41,495.00 to make current payroll. [Plaintiff's Ex. 15, BS 066-085]; [Tape Recording, May 29, 2019, Tr at 10:32:35 – 10:32:52 a.m.]. Additionally, the Debtor and Carriger used $3,700.27 of these corporate funds to make the following expenditures on behalf of themselves:

    a. $9.19 at a corner store on September 29, 2016.

    b. $30.30 at a bar/restaurant (Canyon Creek) on September 29, 2016.

    c. $70.34 at a liquor store (Vic's Liquor) on September 29, 2016.

    d. $175.00 at a spa (Shag Spa and Salons) on September 29, 2016.

    e. $100.08 at a bakery (Crave Bakeshop) on September 30, 2016.

    f. $113.57 at a restaurant (Chili's) on September 30, 2016.

    g. $203.00 on a cash withdrawal on October 1, 2016.

    h. $19.50 at a movie theater (Cinemark) on October 1, 2016.

    i. $57.10 at a grocery store (HEB) on October 1, 2016.

    j. $169.96 at a restaurant (Babin's Seafood House) on October 1, 2016.

    k. $449.23 at a sunglasses store (Sunglass Hut) on October 1, 2016.

    l. $159.18 at a restaurant (Grotto Ristorante) on October 2, 2016.

m. $311.20 at a clothing store (Vineyard Vines) on October 2, 2016.

n. $512.33 at a clothing store (Vineyard Vines) on October 2, 2016.

o. $772.40 at a clothing store (Nordstrom Rack) on October 2, 2016.

p. $40.00 at a hair salon (Blo Blow Dry Bar) on October 4, 2016.

q. $280.00 at a hair salon (Blo Blow Dry Bar) on October 4, 2016.

r. $129.56 at a grocery store (HEB) on October 4, 2016.

s. $24.70 at a gas station (Shell) on October 6, 2016.

t. $73.63 on dry cleaning (MW Cleaners) on October 6, 2016.

[Plaintiff's Ex. 15, BS 066-085].

14. Aside from the expenditures noted above, Blackwolf also used $58,262.90 of the loan proceeds on the following corporate-related items, none of which had anything to do with expansion of Blackwolf's operations in Dallas:

a. $500.00 on Comcast on September 29, 2016.

b. $43.35 at FedEx on September 30, 2016.

c. $21.64 on Apple iTunes on October 2, 2016.[3]

d. $6,704.33 on workforce payment services (FleetCor) on October 3, 2016.

e. $28.20 at the United States Postal Service on October 3, 2016.

f. $131.89 at a restaurant (Papa John's) on October 4, 2016.

g. $146.13 on a cleaning service (Oops Steam Cleaning) on October 4, 2016.[4]

h. $1,005.50 on car payments on October 4, 2016.

i. $11.00 on Texas DPS on October 4, 2016.

---

[3] The Debtor testified that this service was for a Blackwolf employee time-management application.

[4] The Debtor testified that this service was for a Blackwolf vehicle that needed cleaning.

j.   $17.00 on private security in Austin (Texas DPS) on October 4, 2016.

k.   $37.00 on private security in Austin (Texas DPS) on October 4, 2016.

l.   $49.00 on private security in Austin (Texas DPS) on October 4, 2016.

m.  $151.00 on private security in Austin (Texas DPS) on October 4, 2016.

n.   $314.90 on accounting software (Intuit QuickBooks) on October 4, 2016.

o.   $44,724.09 on payroll on October 5, 2016.[5]

p.   $708.15 on legal fees (U.S. Texas LawShield) on October 5, 2016.

q.   $6.47 at the United States Postal Service on October 5, 2016.

r.   $163.25 on Comcast on October 5, 2016.

s.   $3,500.00 on legal fees (Sinoski & Associates) on October 6, 2016.

[Plaintiff's Ex. 15, BS 066-085].

15. By October 7, 2016, Blackwolf had a negative balance in its operating account of $1,039.76. [Plaintiff's Ex. 15, BS 071]. This balance underscores that in one week, Blackwolf spent the entire loan proceeds of $150,000.00 on past due payroll, current payroll, various personal items for the Debtor and Carriger, and several corporate-related expenditures totally unrelated to any expansion in Dallas.[6] [Plaintiff's Ex. 15, BS 071]. The expenditures were clearly evidenced by statements of credit card transactions and checks from Blackwolf's corporate account at Cadence Bank. [Plaintiff's Ex. 15, BS 071].

---

[5] The Court notes that this payroll is separate and distinct from the payrolls listed in Finding of Fact No. 14.

[6] There is no question that: (1) the loan was in the amount of $150,00.00; (2) DMM actually wrote a check payable to Blackwolf; (3) all of the $150,000.00 proceeds were used within one week; and (4) none of these proceeds were used for expansion in Dallas. What is unclear is this: the documentation introduced into evidence at trial shows total use of proceeds of $140,142.42—which means that $9,857.58 are unaccounted for. Although DMM, which clearly has the burden, has failed to show exactly how the remaining $9,857.58 proceeds were used, DMM has nevertheless proven that none of the loan proceeds were used for expansion in Dallas; and it is this point that is key for proving the misrepresentation necessary to successfully obtain relief under section 523(a)(2)(A).

No proceeds at all were spent on expanding Blackwolf's business in Dallas. [Tape Recording, May 29, 2019, Tr. at 11:19:48 – 11:20:59 a.m.]; indeed, the Debtor produced no evidence that any funds were used for expansion in Dallas after the loan proceeds were disbursed but before Blackwolf's balance became negative.

16. On November 20, 2016, the Debtor sent his attorney an email inquiring about the status of the State Court Lawsuit. [Plaintiff's Ex. 5, BS 019]. In the email, the Debtor indicated that the matter needed "immediate attention." [Plaintiff's Ex. 5, BS 019].

17. Blackwolf failed to make the first payment of $4,500.00 on the Note when it became due and payable on December 28, 2016. [Joint Pretrial Statement, Adv. Doc. No. 35, Stipulated Fact No. 10, page 7 of 13]. Through emails and phone messages, Mohn inquired as to the status of repayment when it was past due, but the Debtor failed to respond. [Tape Recording, May 29, 2019, Tr. at 2:17:13 – 2:17:21 p.m.]; [Plaintiff's Ex. 8, BS 025]. Neither Blackwolf nor the Debtor (nor Carriger) ended up making any payments to DMM under the Note. [Tape Recording, May 29, 2019, Tr. at 11:46:47 – 11:46:49 a.m., 2:17:55 – 2:18:04 p.m.]

18. According to the loan repayment schedule under the Note, DMM would have received $177,000.00 in total if Blackwolf had made timely payments. [Plaintiff's Ex. 1, BS 004]. DMM never recovered any of the $150,000.00 principal or one cent of interest.

19. The Debtor filed a voluntary petition for relief under Chapter 13 of the Code on January 23, 2017 ("**Petition Date**"). [Joint Pretrial Statement, Adv. Doc. No. 35, Stipulated Fact No. 11, page 7 of 13].

### III.   CREDIBILITY OF WITNESSES

Only two witnesses testified at the trial: the Debtor and Mohn.[7]  The Court finds that Mohn was a very credible witness and gives substantial weight to his testimony.

The Court finds that the Debtor was less than entirely credible; therefore, the Court gives less weight to his testimony than it does to Mohn's testimony. The Court finds that the Debtor's credibility is questionable because of his selective memory when answering certain questions and his disingenuous attempt to define "business expansion" in Dallas to include using loan proceeds to pay for past-due wages of Blackwolf's employees and other expenses that have absolutely nothing to do with Dallas.

### IV.   CONCLUSIONS OF LAW

#### A. JURISDICTION

This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334(b).  Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [of the Bankruptcy Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This suit is a core proceeding because it is a suit to determine the dischargeability of a specific debt pursuant to 28 U.S.C. § 157(b)(2)(I).  This suit is also core under the general "catch-all" language because such a suit is the type of proceeding that can only arise in the context of a

---

[7] After trial, in a separate hearing on solely the issue of reasonableness of attorneys' fees, a third witness testified: Jeremy Masten, one of DMM's attorneys. The Court finds him to be a very credible witness and gives substantial weight to his testimony.

bankruptcy case. *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987)). Preventing the discharge of a specific debt—here, the amount owed under the Note for which the Debtor is liable under the Guaranty—can only occur in a bankruptcy court. There is no state law equivalent for this action.

## B. Venue

Venue is proper under 28 U.S.C. § 1409(a). 28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending." The Debtor's main Chapter 13 case is presently pending in this Court; therefore, venue of this adversary proceeding is proper.

## C. Constitutional Authority to Enter a Final Judgment in the Adversary Proceeding at Bar

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 564 U.S. 462 (2011), this Court is required to determine whether it has the constitutional authority to enter a final judgment adjudicating the suit at bar. In *Stern*, which involved a core proceeding brought by the debtor under 28 § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." 564 U.S. at 503. As indicated above, the pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The ruling in *Stern* was only limited to the one specific type of core proceeding involved in that dispute, which is not implicated here. Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final judgment here. *See, e.g.,*

*Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547-48 (B.A.P. 8th Cir. 2012) ("Unless and until

the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its

word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28

U.S.C. § 157(b)(2) is constitutional."); *see also Tanguy v. West (In re Davis)*, No. 00-50129, 538

F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. §

157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the

estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect'

. . . . We decline to extend *Stern*'s limited holding herein.") (Citing *Stern*, 564 U.S. at 475, 503).

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought

under § 157(b)(2), *see First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp.*

*Grand Prairie Inc.)*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect'

language may understate the totality of the encroachment upon the Judicial Branch posed by

Section 157(b)(2) . . . ."), this Court still concludes that the limitation imposed by *Stern* does not

prohibit this Court from entering a final judgment in the dispute at bar.  In *Stern*, the debtor filed

a counterclaim based *solely* on state law; whereas, here, the claims brought by DMM are based

*primarily* on an express provisions of the Bankruptcy Code—§§ 523(a)(2)—and judicially-created

bankruptcy law interpreting this provision.[8]  This Court is therefore constitutionally authorized to

enter a final judgment on the complaint filed by DMM.

Finally, in the alternative, this Court has the constitutional authority to enter a final

judgment on DMM's complaint because DMM and the Debtor have consented, impliedly if not

explicitly, to adjudication of this dispute by this Court.  *Wellness Int'l Network, Ltd. v. Sharif*, 135

---

[8] The Court notes that there is some Texas law involved in the claims that DMM has brought under § 523(a)(2)(A).
That is why this Court finds that the claims brought by DMM are based **primarily**, as opposed to **solely**, on federal
law.

S. Ct. 1932, 1947 (2015) ("*Sharif* contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . ."). Here, the parties have never objected to this Court's constitutional authority to enter a final judgment—either in their pleadings or their joint pre-trial statement. Moreover, the parties participated in a day-long trial in this Court, and not once did they ever object to this Court's constitutional authority to enter a final judgment. If these circumstances do not constitute consent—implied, if not express—then nothing does.

### D. Dischargeability of Debt Under 11 U.S.C. § 523(a)(2)(A)

In an adversary proceeding to determine the dischargeability of a debt under § 523(a), the plaintiff bears the burden of proving the elements by a preponderance of the evidence.[9] *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 F. App'x 943, 945 (5th Cir. 2009); *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995); FED. R. BANKR. P. 4005. "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997). However, the Code affords relief only to the "honest but unfortunate debtor," and an individual may not obtain a discharge of debts incurred through his own wrongful conduct. *Grogan*, 498 U.S. at 286; *Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 467 B.R. 410,

---

[9] "A fact is proven by preponderance of the evidence if the finder of fact, here the court, finds it more likely than not, based on the evidence, that the fact is true." *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 736 (Bankr. S.D. Tex. 2017) (quoting *Bale v. Ryan (In re Ryan)*, 443 B.R. 395, 408 (Bankr. N.D. Tex. 2010)).

417 (Bankr. W.D. Tex. 2012). As set forth below, DMM has met its burden of proving the elements of its claims under § 523(a)(2)(A).

### E. Description of the Debt that DMM Asserts Should Not to Be Discharged

At the outset, it is important to define which debt DMM seeks to prevent from being discharged. First, the Debtor executed the Guaranty that guarantees repayment of any amounts owed by Blackwolf under the Note. Thus, because the principal balance of the Note that Blackwolf did not pay is $150,000.00, the Debtor has personal liability for this amount, plus accrued unpaid interest and all other amounts owed under the Note. DMM alleges that the Debtor should not be discharged from this liability. DMM's contention is that pursuant to § 523(a)(2)(A), the Debtor incurred this guarantor liability through false representations or false pretenses associated with the extension of credit that DMM provided to Blackwolf. *See, e.g.*, *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 501 (Bankr. S.D.N.Y. 1999) ("Similarly, it alleges that [the debtor] knew when he personally guaranteed the fees that he had already committed his personal assets to other ventures and could not honor his personal guarantee."); *Buckeye Ret. Co., LLC v. Kakde (In re Kakde)*, 382 B.R. 411, 419 (Bankr. S.D. Ohio 2008) (footnote omitted) ("Buckeye asserts that the debt owed by Mr. Kakde to Buckeye pursuant to Mr. Kakde's personal guaranty is nondischargeable under 11 U.S.C. § 523(a)(2)(B) because USAT obtained advances under the Loan guaranteed by Mr. Kakde . . . by means of the intentional or reckless submissions to Provident of false Borrowing Base Certificates.").

In sum, under guaranty liability, DMM contends that the Debtor owes DMM a nondischargeable debt. The Court will now address DMM's claims as to guarantor liability under § 523(a)(2)(A).

**F. Overview of DMM's Claims under § 523(a)(2)(A) Based Upon the Debtor's Guarantor Liability**

DMM has brought two claims against the Debtor under § 523(a)(2)(A): one for false representations and one for false pretenses.   There is a distinction between false representations and false pretenses. *Wright v. Minardi (In re Minardi)*, 536 B.R. 171, 187 (Bankr. E.D. Tex. 2015) (quotation omitted) ("While false pretenses and false representation both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement."); *Argento v. Cahill (In re Cahill)*, No. 15-72418-REG, 2017 WL 713565, at *6 (Bankr. E.D.N.Y Feb. 27, 2017) ("While most times both conduct and explicit statements by the debtor exist, thereby establishing a fraud under both false pretenses and false representation, the creditor may be able to establish the debtor's conduct without a showing of explicit statements or explicit statements without a showing of the debtor's conduct and still be successful under § 523(a)(2)(A)."); *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 640 (Bankr. D. Colo. 1990) ("'False Pretense' is more like a con game than a stickup.   It is more like being dealt from the bottom of the deck than being mugged.   A false pretense is generally employed by stealth, implication, and misdirection, while fraud and false representations are typically implemented more by fabrication, explication, and diversion.").   Thus, the Court will separately examine DMM's claim for false representations and its claim for false pretenses.

**G. DMM's Claim Under § 523(a)(2)(A) for False Representations**

DMM's first claim against the Debtor is based upon § 523(a)(2)(A) for false representations.  DMM contends that the Debtor obtained financing from DMM for Blackwolf and SG through false representations.  To obtain a judgment that a debt is nondischargeable for false representations, the misrepresentations must have been: (1) knowing and fraudulent falsehoods,

(2) describing past or current facts, (3) that were relied upon by the other party. *Jacobson v. Ormsby (In re Jacobson)*, No. 06-51460, 2007 WL 2141961, at *2 (5th Cir. July 26, 2007); *In re Allison*, 960 F.2d at 483; *RecoverEdge L.P.*, 44 F.3d at 1292–93; *Pasagui v. Perez (In re Perez)*, No. 14-32266-H5, 2017 WL 991042, at *7 (Bankr. S.D. Tex. Mar. 13, 2017); *U.S. Merchs. Fin. Grp., Inc. v. Martin (In re Martin)*, No. 15-41103, 2017 WL 1316928, at *10 (Bankr. E.D. Tex. Apr. 7, 2017). Additionally, DMM must prove the amount of its damages. *See In re Jacobson*, 2007 WL 2141961, at *2 (affirming district court's affirmance of bankruptcy court's determination that "[plaintiff]'s exhibits correctly reflected the amount of damages owed by [debtor]."). The Court now addresses each of the elements that DMM must satisfy.

    1. Knowing and Fraudulent Falsehoods

    The Debtor committed knowing and fraudulent falsehoods in his dealings with DMM. When considering whether a knowing and fraudulent falsehood has been made, the subjective mindset of the promisor is the focus. *Higgins v. Nunnelee (In re Nunnelee)*, 560 B.R. 277, 285 (Bankr. N.D. Miss. 2016). "A misrepresentation is fraudulent if the maker . . . knows or believes . . . the matter is not as represented, or does not have the confidence in the accuracy of his representation as stated or implied, or knows . . . he does not have the basis for his representation as stated or implied. *Id.* (quotations omitted) (citing *AT&T Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 407 (5th Cir. 2001)). A misrepresentation by a debtor of his or her intention to perform contractual duties, for example, may be a false representation under the Code. *Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131–32 (Bankr. N.D. Tex. 2005); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) (internal citations omitted) ("A promise to do an act in the future is actionable fraud when made with the intention, design, and purpose of deceiving, and with no intention of performing the act. While a party's intent is

18

determined at the time the party made the representation, it may be inferred from the party's

subsequent acts after the representation is made."); *Nwokedi v. Unlimited Restoration Specialists,*

*Inc.*, 428 S.W.3d 191, 199 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("A promise of

future performance constitutes an actionable misrepresentation if the promise was made with no

intention of performing at the time the promise was made."). This intent may be inferred from the

fact that the debtor failed to take any steps to perform under the contract. *In re Hurst*, 337 B.R. at

131; *Nwokedi*, 428 S.W.3d at 199 ("The speaker's intent at the time of the representation may be

inferred from the speaker's acts after the representation was made.").

> Intent is a fact question within the realm of the trier of fact because it is dependent
> upon the credibility of the witnesses and the weight to be given their testimony . . .
> . [B]reach of a promise to perform combined with "slight circumstantial evidence"
> of fraud constitutes some evidence of fraudulent intent and is legally sufficient to
> support a verdict.

*Nwokedi*, 428 S.W.3d at 199 (citation omitted). The debtor's silence regarding a material fact can

also constitute a false representation. *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 399 (5th

Cir. 2017); *Mora v. Abraham (In re Abraham)*, No. 10-03227, 2014 WL 3406513, at *3 (S.D. Tex.

July 7, 2014). "When one has a duty to speak, both concealment and silence can constitute

fraudulent misrepresentation; an *overt act* is *not* required." *In re Selenberg*, 856 F.3d at 399

(emphasis in original).

In the suit at bar, DMM asserts that the Debtor had no intention for Blackwolf or himself

to repay the Note as promised because: (1) the Debtor and Carriger immediately used some of the

loan proceeds to pay for extravagant personal expenses [Finding of Fact No. 13];[10] (2) Blackwolf

immediately used all of the other loan proceeds to pay Blackwolf's past-due payroll, current

---

[10] The Debtor testified that the Blackwolf corporate account funded trips to the movies, hair salons, restaurants, rent
for his and Carriger's apartment, and expensive clothing purchases. [Tape Recording, May 29, 2019, Tr. at 11:20:18
– 11:27:40 a.m.]

payroll, and numerous other expenses [Finding of Fact Nos. 14-15]; (3) none of the loan funds were used to expand business in Dallas [Finding of Fact Nos. 13-15]; (4) the Debtor did not make a single loan payment on the Note [Finding of Fact No. 17]; (5) the Debtor believed that Blackwolf was in survival mode in late August and September of 2016 [Finding of Fact No. 11], and therefore he knew when he signed the Note and the Guaranty that the funds would not be used for expansion of business in Dallas; and (6) the Debtor filed for bankruptcy shortly after the payments under the Note came due but after all of the loan proceeds were already spent [Finding of Fact Nos. 17-19]. The contract between Blackwolf and DMM—i.e. the Note—was understood to be for a loan by which Blackwolf would expand its Dallas operation. [Finding of Fact No. 7]. Yet, DMM presented clear and unequivocal evidence that the Debtor (and Carriger) used all of the loan proceeds for their own personal benefit and for payment of Blackwolf's expenses that had nothing to do with expansion of operations in Dallas. [Finding of Fact Nos. 13-14]. Indeed, the Debtor presented no evidence that he directly used any of DMM's loan to expand Blackwolf's Dallas operations. [Finding of Fact No. 15]. The Debtor's rapid use of the loan funds for personal and corporate purposes that had nothing to do with expansion in Dallas and his subsequent failure to answer Mohn's communications indicate that the Debtor, well before he executed the Note and the Guaranty on September 28, 2016, had no intention of using the funds to expand the Dallas operation or pay back the loan according to the terms of the Note and the Guaranty.

Furthermore, the Debtor deliberately failed to disclose Blackwolf's involvement in the State Court Lawsuit. [Finding of Fact No. 9]. This point is underscored by the fact that the Debtor asked his attorney about the status of the State Court Lawsuit after the Debtor told Mohn that Blackwolf was not involved in any legal proceedings in the early June 2016 meeting. [Finding of Fact Nos. 7, 16]. The State Court Lawsuit was filed on or about August 22, 2016. [Finding of

Fact No. 9]. The Debtor did not disclose to Mohn Blackwolf's involvement in the State Court Lawsuit before the loan proceeds were disbursed on September 28, 2016. [Finding of Fact Nos. 9, 12]. Yet, the Note required that Blackwolf provide notice of any litigation or dispute threatened against or affecting Blackwolf. [Finding of Fact No. 11]. Therefore, Blackwolf had a duty to tell inform DMM about any litigation or dispute threatened against or affecting Blackwolf. Because silence can constitute fraudulent misrepresentation when one has a duty to speak,[11] the Debtor fraudulently misrepresented material facts concerning the status of Blackwolf's involvement in the State Court Lawsuit.

In response to DMM's allegations, the Debtor contends that he believed the litigation would have no effect on Blackwolf and that he always intended to repay the loan, but circumstances beyond his control prevented him from doing so. [Tape Recording, May 29, 2019, Tr. at 11:57:37 a.m. – 12:03:02 p.m.]. The Debtor's testimony does not reflect his actions, and this Court simply does not believe him. Indeed, the Debtor expressly asked his attorney about the status of the State Court Lawsuit. [Finding of Fact No. 16]. This would not have occurred if he was positive the lawsuit would not affect Blackwolf. Furthermore, the Debtor indicated that the matter required immediate attention, demonstrating his perception of the lawsuit's significance. [Finding of Fact No. 16]. Moreover, the Debtor's failure to communicate at all with Mohn upon the failure to make timely payments under the Note was well within his control. [*See* Finding of Fact No. 17]. If the Debtor was intent on repaying the loan, he would have been more communicative and forthright with Mohn. Dodging calls and emails and quickly filing bankruptcy indicates the Debtor did not intend to repay the loan at the time the first payment came due. [*See* Finding of Fact Nos. 17, 19].

---

[11] *See In re Selenberg*, 856 F.3d at 399.

For all of the above-referenced reasons, DMM has met its burden of establishing that the Debtor committed knowing and fraudulent falsehoods.

    2.  <u>The Debtor Described Past or Current Facts</u>

The Fifth Circuit has explained that "a promise to perform acts in the future is not considered a qualifying misrepresentation merely because the promise subsequently is breached." *In re Allison*, 960 F.2d at 484. "A debtor's misrepresentations of his intentions, however, may constitute a false representation within the meaning of the dischargeability provision if, when the representation is made, the debtor has no intention of performing as promised." *Metz v. Bentley (In re Bentley)*, 531 B.R. 671, 688 (Bankr. S.D. Tex. 2015) (quoting *In re Allison*, 960 F.2d at 484). Additionally, the Fifth Circuit has further noted that misrepresentations concerning a past or "current fact of his *future intention*" will satisfy this element. *In re Allison*, 960 F.2d at 484 (emphasis added).

DMM asserts that the Debtor's misrepresentations in meetings with Mohn concerned current facts of his future intention—namely, that the Debtor was going to use the loan funds for business expansion in Dallas. The Debtor argues that he did not describe a past or current fact, which in turn leads him to assert that DMM has failed to satisfy its burden of proving past or current facts.

This Court disagrees. The Debtor accepted the loan proceeds on September 28, 2016, knowing full well that he and Carriger would—within a few days—use all the loan funds to pay for personal items and corporate expenses having nothing to do with expanding Blackwolf's business in Dallas. [Finding of Fact Nos. 13, 14]. After all, the Debtor—without any disclosure whatsoever to DMM for the five weeks between the commencement of the State Court Lawsuit and the loan disbursement on September 28, 2016—knew that: (1) the State Court Lawsuit existed;

(2) Blackwolf was in default on its employee payroll; and (3) Blackwolf was in "survival mode" due to a lack of cash flow. [Finding of Fact Nos. 9-11]. Under these circumstances, the Court finds that the Debtor's representations made about the use of the loan proceeds for expansion in Dallas were representations that the Debtor had no intention of performing as promised at the time Blackwolf accepted the $150,000.00 from DMM. DMM has therefore satisfied its burden in this respect.[12]

Case law supports this conclusion. In *Jacobson*, the borrower represented to the lender that he would use any loan proceeds advanced by the lender for a specific purpose. *Jacobson v. Ormsby (In re Jacobson)*, No. 04-51572-RBK, 2006 WL 2796672, at *10 (W.D. Tex. Sept. 26, 2006). Subsequently, the borrower immediately spent the loan proceeds to pay "existing debts or other obligations [unrelated to the specific purpose], which left no remaining funds" for that specific purpose. *Id.* The court held that the borrower's representations described past or current facts, and not future facts; and therefore, the debt was held to be nondischargeable under § 523(a)(2)(A). *Id.*; *see also Kan. Nat'l Bank & Trust Co. v. Kroh (In re Kroh)*, 88 B.R. 972, 984 (Bankr. W.D. Mo. 1988) ("Further, the testimony of the Bank's officers clearly supports the Court's finding that the Bank relied on the misrepresentations made by [the debtor] concerning

---

[12] There is no merger clause in the Note or the Guaranty. Therefore, any oral representations made prior to the Debtor's execution of the Note and the Guaranty do come into play and are considered by this Court as part of its decision. Moreover, even though the parole evidence rule prohibits consideration of extrinsic evidence to vary, add to, or contradict the terms of an unambiguous written agreement, the rule does not preclude such evidence if there has been fraud, accident, or mistake. *Carrizo Oil & Gas, Inc. v. Barrow-Shaver Res.*, 62 Tex. Sup. Ct. J. 1385, 2019 WL 2668317 (Tex. June 28, 2019). Parties must disclose known defects even if they include a general merger clause in the lease agreement. *Italian Cowboy Partners, Ltd. V. Prudential Ins. Co. of America*, 341 S.W.3d 335-36 (Tex. 2011). Here, there was no merger clause, and so the Debtor was especially required to disclose a known defect. Therefore, there was fraud on the Debtor's part in failing to correct a statement that subsequently became false—i.e. the representation that the Debtor made to Mohn at the June, 2016 meeting that all of the loan proceeds would be used to expand Blackwolf's business in Dallas. *Italian Cowboy Partners* further held that "[i]t is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement." *Italian Cowboy Partners*, 341 S.W.3d at 332 (quoting *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (1957)). Refusing relief in cases of fraud would be "thwarting the general policy of the law." *Id.*

use of the loan proceeds. The Bank was assured orally at least twice and in writing that the loan proceeds were to be used for the brothers' personal investment.").

Like the borrower in *Jacobson*, the Debtor, in his communications with Mohn prior to the September 28, 2016 loan closing, expressly stated that the loan proceeds were to be used to help fund Blackwolf's Dallas expansion. [Finding of Fact No. 7]. Instead, the Debtor used the loan proceeds of $150,000.00 to pay for his own personal expenses and corporate expenses of Blackwolf totally unrelated to the Dallas expansion. [Finding of Fact Nos. 13, 14]. Indeed, not one dime was spent on Dallas expansion efforts. [Finding of Fact No. 15]. This is because contrary to what the Debtor repeatedly represented to Mohn in his communications with him prior to the September 28, 2106 loan closing, the Debtor did not intend for Blackwolf's loan to be used for Blackwolf's Dallas operations at the time the loan proceeds were disbursed. Rather, at the time the loan proceeds were disbursed, he intended that any loan proceeds advanced under the Note would be used for his own and Carriger's personal expenses and coming current with Blackwolf's pre-existing debts, not the least of which was its past-due payroll. [*See* Finding of Fact Nos. 13-15]. Indeed, this is why the Debtor did not return any of Mohn's attempts at communication when the first payment on the Note became due, but was not paid. [*See* Finding of Fact No. 17]. This is also why the Debtor, prior to the loan closing of September 28, 2016, did not make disclosure about: (1) the existence of the State Court Lawsuit; (2) Blackwolf's existing default on its own payroll; (3) that Blackwolf was in a "survival mode" as opposed to an "expansion mode"; and (4) his intention, plus Carriger's intention, to use some of the loan proceeds for personal luxury items. [*See* Finding of Fact Nos. 9-11, 13]. The Debtor most assuredly did not want DMM to know that all loan proceeds would be used for Blackwolf's backpay and the Debtor and Carriger's personal expenses, as the Debtor knew that DMM would not advance funds under the Note if it knew that

24

the loan proceeds would be used for something other than the purpose of expanding business operations in Dallas.

Under all of these circumstances, the Court finds that in the first instance, the Debtor's representation that Blackwolf was not in litigation was a false statement about a current fact because on the date of the loan closing—September 28, 2016—Blackwolf was a defendant in the State Court Lawsuit. [Finding of Fact No. 9]. Hence, DMM has met its burden to prove a current fact. Moreover, as of the date of the loan closing, the Debtor knew that Blackwolf was in default to its own employees and was in a "survival mode," and yet he deliberately failed to disclose these current facts to Mohn that would have corrected the false impression that Mohn had on that day that Blackwolf was in sound financial shape and that the loan proceeds would be used solely for business expansion purposes in Dallas. [*See* Finding of Fact Nos. 6-7, 10-12]. This Court finds that the Debtor's silence about these current facts satisfies this second element of section 523(a)(2)(A) for false representations. Indeed, like the debtor in *Jacobson*, the Debtor here immediately spent the loan proceeds by paying for items other than what DMM believed the loan proceeds would be used for based upon the Debtor's express representations. [*See* Finding of Fact No. 7].

Thus, for all of the above-referenced reasons, this Court concludes that DMM has satisfied its burden and finds that the Debtor's representations described past or current facts.

### 3. DMM Relied Upon the Debtor's False Representations

The next element to obtain a judgment that a debt is nondischargeable for false representations is the necessity that DMM relied on the Debtor's representations. *Field v. Mans*, 516 U.S. 59, 74 (1995); *In re Bandi*, 683 F.3d at 675. Mohn very credibly testified at trial that he relied upon the oral representations the Debtor made at their initial meeting to fund $150,000.00

under the Note. [*See* Finding of Fact Nos. 7, 12]. Because DMM's claim is brought under § 523(a)(2)(A), the test is whether DMM justifiably relied—as opposed to reasonably relied—upon the representations made by the Debtor. *Field*, 516 U.S. at 70; *see also Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 74 (1st Cir. 1998) ("The rationale for placing this relatively low burden on the victim of the misrepresentation is rooted in the common law rule that the victim's contributory negligence is not a defense to an intentional tort."). As *Third Coast Bank* points out, "justifiable reliance does not impose a duty to investigate unless the falsity of the representation is readily apparent or obvious, or there are 'red flags' indicating that reliance is unwarranted." *Cohen v. Third Coast Bank, SSB*, No. 1:13–CV–610, 2014 WL 2729608, at *9 (E.D. Tex. June 16, 2014). A creditor has no duty to investigate a debtor's representation, unless the "falsity of the representation is readily apparent." *Guion v. Sims (In re Sims)*, 479 B.R. 415, 425 (Bankr. S.D. Tex. 2012) (citing *Field*, 516 U.S. at 70–71); *see also In re Minardi*, 536 B.R. at 187–88 ("Justifiable reliance does not require a plaintiff to demonstrate reasonableness nor does it impose a duty to investigate unless the falsity is readily apparent."). To determine whether a creditor justifiably relies on a misrepresentation, the court must examine the "circumstances of a particular case and the characteristics of a particular plaintiff, [and] not . . . an objective standard." *In re Sims*, 479 B.R. at 425; *see also In re Minardi*, 536 B.R. at 187 (emphasis in original) (citation omitted) ("Justifiable reliance requires proof that a plaintiff *actually relied* upon the defendant's false representations and that such reliance was justified under the circumstances.").

DMM asserts that it justifiably relied on the representations the Debtor made at their initial meeting in June of 2016, and subsequent meeting in late August of 2016, as well as the Debtor's silence regarding Blackwolf's involvement in the State Court Lawsuit and its "survival mode" status by the time the loan proceeds were disbursed. [*See* Findings of Fact Nos. 7-9, 11]. And, in

fact, DMM has proven that at the time the loan proceeds were disbursed, the Debtor failed to disclose the existence of the State Court Lawsuit or that Blackwolf was in survival mode and was not going to use the funds for expansion into Dallas, but rather to pay past-due corporate debts, existing corporate debts unrelated to Dallas expansion, and the personal expenses of the Debtor and Carriger. [*See* Findings of Fact Nos. 14-15].

Under all of these circumstances, the Court finds that DMM justifiably relied upon the representations that the Debtor made orally to Mohn at the meeting in early June of 2016, the meeting in late August of 2016, and the silence between the late August of 2016 meeting and September 28, 2016, when the loan funds were disbursed. It was not readily apparent or obvious to Mohn that the representations were false; he had no reason to believe that the Debtor was lying to him about Blackwolf being in good financial standing or was not involved in any litigation or dispute threatened against or affecting it. There were simply no "red flags"—to use the language of *Third Coast Bank*—that would have required DMM to further investigate whether the Debtor's representations—namely, that all loan proceeds would be used for expansion in Dallas—might be inaccurate and therefore should not have been relied upon. Moreover, Magill had previously referred prospective borrowers to DMM [Finding of Fact No. 3], and there is no evidence that DMM had experienced any issues of dishonesty or lack of integrity with these individuals. Here, DMM had a track record with Magill's referred borrowers that gave it some level of comfort about the Debtor that it otherwise might not have had.

Under all of these circumstances, the Court finds that DMM has met its burden of showing that it justifiably relied upon the Debtor's representations.

4. The Debtor's Conduct Caused Damage to DMM

There is no question that the Debtor's conduct caused damage to DMM. Not only did the Debtor deprive DMM of the funds it loaned to Blackwolf by deliberately remaining silent about Blackwolf's poor financial condition and involvement in the State Court Lawsuit and signing loan documents containing provisions with which he had no intention of complying; the Debtor also deprived DMM from recovering the $150,000.00 it loaned to Blackwolf or any of the interest that accrued on the loan. [Finding of Fact No. 18]. But for the skullduggerous actions of the borrower's principal—i.e., the Debtor—DMM would have suffered no harm. Therefore, the Debtor undeniably caused damage to DMM. *In re Kroh*, 88 B.R. at 984 ("The Bank has been damaged in the amount of the unpaid balance on each note, the interest accrued on the notes, and the attorney's fees incurred. Absent, [the debtor's] misrepresentations the Bank would not have loaned the money to [the debtor] and these damages would not have occurred.").

In sum, DMM has met its burden in establishing all of the elements of a claim for false representations. Therefore, this Court finds that all of the indebtedness owed under the Note and the Guaranty is non-dischargeable. The Court now addresses DMM's claim for false pretenses.

## H. DMM's Claim under § 523(a)(2)(A) for False Pretenses

DMM's second claim against the Debtor is based upon § 523(a)(2)(A) for false pretenses. To obtain a judgment that a debt is nondischargeable for false pretenses, the creditor must show the following: (1) the debtor engaged in conduct "wronging one in his property rights by dishonest methods or schemes [such as] deprivation of something of value by trick, deceit, chicane[ry] or overreaching;" (2) scienter or intent; (3) causation; and (4) damages. *Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 701–02 (Bankr. S.D.N.Y. 1998). "While false pretenses and false representation both involve intentional conduct intended to create and foster a false impression,

the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement." *In re Minardi*, 536 B.R. at 187 (quotation omitted). Further, a false pretense "involves implied misrepresentation or conduct intended to create and foster a false impression . . . ." *Leeb v. Guy (In re Guy)*, 101 B.R. 961, 978 (Bankr. N.D. Ind. 1988). The Court now addresses each of the elements that DMM must satisfy.[13]

### 1. The Debtor's Dishonest Conduct Injured DMM's Property Interest

The Debtor's dishonest conduct prior to the loan closing resulted in injury to DMM's property interest: namely, the $150,000.00 that DMM loaned Blackwolf that DMM never recovered. [*See* Finding of Fact No. 18]. In early June of 2016, the Debtor and Magill first met with Mohn to discuss funding Blackwolf and SG's expansion into Dallas. [Finding of Fact No. 7]. Importantly, the Debtor only indicated the need for financing for Blackwolf and SG's expansion [*id.*], not for Blackwolf's previously incurred debts or for luxury items for the Debtor and Carriger. [*See* Finding of Fact Nos. 13-14]. Yet, while DMM was considering funding Blackwolf's expansion during late August and September of 2016, Blackwolf was in survival mode, did not make timely payroll to its employees, and was sued in the State Court Lawsuit;

---

[13] One court, in distinguishing between a claim for false representation and a claim for false pretenses, has stated the following:

> While most times both conduct and explicit statements by the debtor exist, thereby establishing a fraud under both false pretenses and false representation, the creditor may be able to establish the debtor's conduct without a showing of explicit statements or explicit statements without a showing of the debtor's conduct and still be successful under § 523(a)(2)(A).

*Argento v. Cahill (In re Cahill)*, No. 15-72418-REG, 2017 WL 713565, at *6 (Bankr. E.D.N.Y Feb. 27, 2017). In the suit at bar, DMM has proven explicit representations made by the Debtor and therefore successfully met its burden on its claim for false representations. Now, in assessing DMM's claim for false pretenses, this Court finds that DMM has proven sufficient misconduct by the Debtor, but this conduct is intertwined with express representations. Thus, to the extent that this "false pretenses" section discusses express representations made by the Debtor, not only do they help DMM establish its claim for false pretenses, but they also help DMM further establish its claim for false representations.

meanwhile, the Debtor said absolutely nothing to DMM about these facts. [Finding of Fact Nos. 9-11]. The Debtor had a duty to disclose to DMM after Blackwolf's involvement in the State Court Lawsuit that it was involved in the State Court Lawsuit given that Mohn had asked the Debtor if Blackwolf was involved in legal proceedings at the first meeting in early June and the Debtor answered that it was not.[14] [Finding of Fact No. 7]. The Debtor also had a duty to disclose that Blackwolf had not made payroll and was in "survival mode" after leading Mohn to believe that the loan proceeds would be used only for expansion and that Blackwolf was in a favorable financial position. [Finding of Fact Nos. 7, 10-11]. *See Check Control, Inc. v. Anderson (In re Anderson)*, 181 B.R. 943, 950 (Bankr. D. Minn. 1995) (citation omitted) (noting that false pretenses can also consist of "silence when there is a duty to speak"); *Minority Equity Capital Corp. v. Weinstein (In re Weinstein)*, 31 B.R. 804, 810 (Bankr. E.D.N.Y. 1983) (stating when finding that debtor's conduct amounted to false pretenses, that "[c]ase law has additionally gone so far as to extend an affirmative duty to a party in a business transaction to disclose all the facts the concealment of which would mislead the other side."). The Debtor's silence was deafening; his failure to make these disclosures to DMM led DMM to believe that Blackwolf was in a favorable financial standing, ready and able to expand in Dallas, and not involved in legal proceedings at the time Mohn made the decision for DMM to loan Blackwolf $150,000.00 on September 28, 2016.

The Debtor and Carriger then went to the loan closing on September 28, 2016, and signed the Note and Guaranty while continuing to say nothing about Blackwolf's survival mode financial situation, including failure to make payroll, or involvement in the State Court Lawsuit, or their intention to purchase personal luxury items—all of which led DMM to believe that: (1) Blackwolf

---

[14] *See In re Selenberg*, 856 F.3d at 399.

was in a favorable financial position and not involved in any litigation; and (2) any proceeds funded under the Note would be used for solely Blackwolf's and SG's Dallas expansion operations. The Debtor's conduct was dishonest and harmed DMM because: (1) DMM did not have an opportunity to weigh whether it wanted to make the loan given the adverse change in Blackwolf's financial position; (2) DMM did not have an opportunity to weigh whether it wanted to make the loan given Blackwolf's involvement in the State Court Lawsuit; and (3) DMM did not know Blackwolf was in the woeful cash flow position that it was when DMM disbursed the loan proceeds. [Finding of Fact Nos. 9-12]. Stated differently, the Debtor's deceitful conduct during late August and September of 2016 deprived DMM of its right to know the intended purpose of the loan and how much risk was actually associated with the loan—all of which eventually resulted in DMM being duped into advancing $150,000.00 as an unsecured loan that has never been repaid. [Finding of Fact No. 18]. The Court finds that the Debtor's conduct was dishonest and falls within the parameters of "false pretenses." *In re Dunston*, 117 B.R. at 641 ("This Court construes 'false pretense' in the context of Section 523(a)(2)(A) to mean, generally, a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.").

The Debtor had a duty to disclose to DMM the facts about Blackwolf's involvement in the State Court Lawsuit and weak financial position before proceeding with the loan closing, but he deliberately chose not to do so. *Phillips 66 Co. v. Miltenberger (In re Miltenberger)*, 538 B.R. 547, (Bankr. E.D. Mo. 2015) (quotation omitted) ("[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of

Section 523(a)(2)(A)."); *In re Weinstein*, 31 B.R. at 810 ("Case law has additionally gone so far as to extend an affirmative duty to a party in a business transaction to disclose all the facts the concealment of which would mislead the other side."); *In re Hurst*, 337 B.R. at 133 ("Put simply, if Party 1 is under a mistaken impression as to the truth of a set of facts and Party 2 is aware of the truth and of the mistaken impression, Party 2 is under a duty to correct that mistake prior to the consummation of the transaction."). The Debtor's chicanery deprived DMM of its right to protect its financial interest in the $150,000.00 that DMM advanced to Blackwolf.

The Debtor's complete silence about the State Court Lawsuit and Blackwolf's financial woes constitutes extreme dishonesty on his part that created a false impression upon which DMM relied to advance $150,000.00 on September 28, 2016.

Under the circumstances described above, this Court finds that DMM has met its burden in proving the existence of the first element of false pretenses.

　　2.　The Debtor Had Scienter or Intent to Deceive

"When deciding whether a creditor has satisfied the 'intent' prong of a 'false pretenses' dischargeability exception, the bankruptcy court must consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor, indicating an intent to deceive his creditor." *In re Hurst*, 337 B.R. at 133; *see also In re Dunston*, 117 B.R. at 641. Here, the Debtor's sophistication, business acumen, and long-term experience in the security business underscore that he was fully aware of his wrongful intentions and that he knew exactly what he was doing when he led DMM to believe that the loan proceeds would be used for Blackwolf and SG's Dallas expansion and that Blackwolf was in good financial standing and was not involved in any legal proceedings at the time the loan proceeds were disbursed. [Finding of Fact Nos. 7, 9-12]. The evidence reflects that the Debtor represented to Mohn that Blackwolf was

in good financial standing and not involved in the State Court Lawsuit both by affirmative statements and then by silence between the first meeting in early June 2016 and the time the loan proceeds were disbursed on September 28, 2016. [Finding of Fact Nos. 7-12]. Viewed in the aggregate, this Court finds that these circumstances present a picture of deceptive conduct by the Debtor, indicating on his part a clear intent to deceive DMM. *See, e.g.*, *In re Hurst*, 337 B.R. at 133–34 (stating, when holding the debt made by the debtor nondischargeable for false pretenses, that "[i]ntent to deceive is present if a debtor intends or has reason to expect a creditor to act, or to refrain from action, in reliance upon the debtor's misrepresentation; a result is intended if a debtor either acts with desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct.").

This Court finds that the Debtor knew the intended use of the loan proceeds and the incorrect perception Mohn had about Blackwolf's financial standing and involvement in the State Court Lawsuit. The Debtor knew that he had represented to Mohn at the initial meeting in June of 2016 that the funds would be used solely for Blackwolf and SG's Dallas expansion. [Finding of Fact No. 7]. Further, the Debtor knew that Mohn had inquired about Blackwolf's involvement in any legal proceedings and the Debtor had told Mohn Blackwolf was not involved in any lawsuits [Finding of Fact No. 9], so Mohn continued to believe Blackwolf was not involved in any such proceedings when that was in fact not true; indeed, the State Court Lawsuit was begun in August of 2016. [Finding of Fact Nos. 9, 12]. Though the Debtor knew of Mohn's incorrect impressions about Blackwolf prior to the loan being disbursed, the Debtor did not make any attempt to correct these impressions, which he had a legal duty to do. *See In re Selenberg*, 856 F.3d at 399. The Debtor's failure to correct Mohn's false impressions about Blackwolf unquestionably shows an intent to deceive DMM. Further, the Debtor's willingness to sign the Note—which expressly

33

contained a provision that Blackwolf would provide DMM with notice of any litigation [Finding of Fact No. 11]—while he remained silent about the State Court Lawsuit is yet another indication of his intent to deceive. The Debtor therefore knew, or is charged with having known, that he was making misrepresentations to DMM concerning Blackwolf's financial standing and involvement in the State Court Lawsuit.

For all of the reasons set forth above, this Court finds that DMM has met its burden in establishing that the Debtor had scienter.

3.  The Debtor's Actions Caused DMM to Lose its Property Interest

When discussing DMM's false representation claim above in the section on false representations, this Court noted that DMM had to demonstrate its justifiable reliance on the representations made by the Debtor. DMM does not bear such a burden in its claim for false pretenses. As one court has stated:

> With respect to [justifiable reliance], it is not meaningful to examine into the "justifiable reliance" of a creditor in the case of fraudulent or deceitful conduct involving non-disclosure or concealment. But "reliance" in classic fraud is, in reality, nothing more nor less than the element of causation, since it is the creditor's reliance which provides the causal link between the debtor's false representation and the creditor's damage. Thus, in a case involving false pretenses or fraud based upon the debtor's non-disclosure or concealment, classic reliance cannot and need not be proved, but the creditor must nevertheless establish a causal link between the debtor's misconduct and the creditor's injury.

*In re Luppino*, 221 B.R. at 701; *see also In re Bentley*, 531 B.R. at 688 ("Fraud by non-disclosure is a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts.") (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)).

It is clear to this Court that the Debtor concealed the following material facts from DMM: (1) Blackwolf's involvement as a defendant in the State Court Lawsuit [Finding of Fact No. 9];

(2) Blackwolf's being in default on its own payroll [Finding of Fact No. 10]; (3) Blackwolf was in "survival mode" and not in a good financial standing after the second meeting in late August of 2016 [Finding of Fact No. 11]; and (4) the Debtor's intention to use some of the loan proceeds to purchase luxury items for himself and Carriger [Finding of Fact No. 13]. Without knowledge of these pertinent facts, DMM had no idea that its loan would not be repaid at all. Moreover, although the court in *Luppino* suggests that there is no need to examine DMM's justifiable reliance in this suit, there is no question that a reasonable and prudent lender would not lend money to a company similarly situated to Blackwolf while knowing all of the facts that the Debtor failed to disclose. Stated differently, but for the Debtor's non-disclosure of the material facts mentioned above, DMM would not have extended the loan to Blackwolf. In sum, it is clear that the Debtor's misconduct caused DMM: (1) to provide funding of $150,000.00 that it would not have otherwise provided; and (2) to then subsequently fail to recover any of its loan.

### 4. The Debtor's Conduct Caused Damage to DMM

As previously discussed herein, there is no question that the Debtor's conduct caused damage to DMM. The Debtor deprived DMM of the $150,000.00 of proceeds disbursed under the Note, and also deprived DMM of the accrued unpaid interest due thereunder, by accepting loan funds that he had no intention of repaying [*See* Finding of Fact Nos. 13, 17-18]. But for the skullduggerous actions described above of the borrower's principal—i.e., the Debtor—DMM would have suffered no harm. Therefore, the Debtor undeniably caused damage to DMM. *In re Kroh*, 88 B.R. at 984 ("The Bank has been damaged in the amount of the unpaid balance on each note, the interest accrued on the notes, and the attorney's fees incurred. Absent, [the debtor's] misrepresentations the Bank would not have loaned the money to [the debtor] and these damages would not have occurred.").

In sum, DMM has met its burden in establishing all of the elements of its claim for false pretenses. Accordingly, the Court finds that debt incurred by the Debtor by virtue of his execution of the Guaranty—which totals all amounts owed under the Note (including unpaid principal of $150,000.00, accrued, unpaid, interest, and attorneys' fees and expenses)—was incurred through false pretenses, which in turn leads this Court to conclude that this amount is a nondischargeable obligation. The Court now addresses the amount of accrued unpaid interest owed under the Note and why this interest constitutes a nondischargeable obligation.

## I. Pre- and Post-Judgment Interest

### 1. Pre-Judgment Interest

At first blush, it would appear that DMM is not entitled to pre-judgment interest because unsecured claimants—which is the category into which DMM fits [Finding of Fact No. 12]—are generally not entitled to recover post-petition interest. 11 U.S.C. § 502(b)(2).[15] Thus, the knee-jerk reaction would be that DMM is not entitled to recover any interest under the Note that would otherwise accrue from the Petition Date up until the date that this Court enters judgment in this adversary proceeding. However, "[i]f the claim is nondischargeable, so also is the interest that continues to accrue on that claim." *In re Sullivan*, 195 B.R. 649, 653 (Bankr. W.D. Tex. 1996).[16] Here, this Court has held that DMM's claim under the Guaranty and Note is nondischargeable. Accordingly, pursuant to the holding in *In re Sullivan*, this Court finds that DMM is entitled to pre-judgment interest—i.e., interest that has accrued under the Note from the date of disbursement

---

[15] The Court notes that DMM, as an unsecured creditor, is unquestionably entitled to claim interest that has accrued from the date of the execution of the Note to the Petition Date. The issue is whether DMM, as an unsecured creditor, is entitled to claim interest that has accrued from the Petition Date up to the date that this Court enters judgment.

[16] The Court notes that the *In re Sullivan* opinion gives a detailed discussion of case law supporting the conclusion that if a claim is nondischargeable, then interest continues to accrue on that claim after the filing of the debtor's bankruptcy petition. This Court finds the reasoning set forth therein to be very persuasive and adopts it in the suit at bar.

of the loan proceeds (i.e. September 28, 2016) up to the date that this Court enters judgment. The question now is how to calculate the amount of pre-judgment interest.

Interest under the Note accrues at a per diem rate of $49.32.[17] The loan disbursement date was September 28, 2016. The date that this Court is entering judgment on the docket is July 19, 2019. Thus, interest has accrued for 1024 days, which means that the total amount of interest that has accrued is $50,503.68 (i.e. $49.32 x 1024).

When the pre-judgment interest of $50,503.68 is added to the outstanding principal owed under the Note—i.e., $150,000.00—the total amount of the nondischargeable debt owed by the Debtor (excluding attorneys' fees and costs) is $200,503.68 (the "**$200,503.68 Debt**").

2.  Post-Judgment Interest on the $200, 503.68 Debt

28 U.S.C. § 1961(a) sets forth that interest "shall be allowed on any money judgment in a civil case recovered in a district court." This statute also "applies to judgments entered by a bankruptcy court." *Ocasek v. Manville Corp. Asbestos Disease Comp. Fund*, 956 F.2d 152, 154 (7th Cir. 1992). Further, the statute sets forth that the interest will be at the rate of the "weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a) (footnote omitted). For the week of July 15, 2019, the post-judgment interest rate for federal judgments is 1.97% per annum. *Post-Judgment Interest Rates*, United States District & Bankruptcy Court Southern District of Texas, http://www.txs.uscourts.gov/page/post-judgment-interest-rates (last visited July 19, 2019). Accordingly, the Court will grant post-judgment interest to DMM, and the rate that will be in effect on the date of the entry of the judgment will be 1.97%

---

[17] The Court makes this finding because DMM's Proof of Claim, which is Exhibit 32, expressly sets forth that the per diem is $49.32. Moreover, this Court has independently done the calculation by reviewing the Note, which expressly sets forth that the principal amount is $150,000.00 and the interest rate is 12% per annum. The calculation of the per diem is therefore derived as follows: $150,000.00 x 12% / 365 days = $49.32 per diem.

per annum. *In re Beveridge*, 416 B.R. at 581–82 (awarding post-judgment interest on debt that was declared nondischargeable pursuant to § 523(a)(2)(A)); *Boyington Capital Grp., LLC v. Haler (In re Haler)*, Adv. No. 10-4217, 2016 WL 825668, at *14–15 (Bankr. E.D. Tex. Mar. 2, 2016) (same); *Gronewoller v. Mascio (In re Mascio)*, No. 03-1482 MER, 2014 WL 2621201, at *9 (Bankr. D. Colo. June 12, 2014) (same).

This Court's award of post-judgment interest will accrue during the period from the date the judgment is rendered until the date the judgment is satisfied. *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 331–32 (5th Cir. 1995). Further, the Court concludes that all post-judgment interest is nondischargeable, once again relying upon the language in *Cohen* that the nondischargeable debt includes "other relief." *See Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998); *Fire Prot. Servs., LP v. Ayesh (In re Ayesh)*, 465 B.R. 443, 449–50 (Bankr. S.D. Tex. 2011); *Miller v. Lewis*, 391 B.R. 380, 385 (E.D. Tex. 2008).

### J. Attorneys' Fees and Expenses

#### 1. Applicable Law

With respect to DMM's request for attorneys' fees, the holding in *Cohen* is that a nondischargeable debt in a § 523(a)(2)(A) claim encompasses not only the debt created by the fraud, but also an award of attorneys' fees and expenses, among other damages. Stated differently, the word "debt" in § 523(a)(2)(A) includes any form of damage that can be causally linked to the conduct that gives rise to the nondischargeable debt. *Cohen*, 523 U.S. at 220; *Light v. Whittington (In re Whittington)*, 530 B.R. 360, 386–88 (Bankr. W.D. Tex. 2014). Here, the Court concludes that the attorneys' fees and expenses incurred by DMM for the prosecution of the adversary proceeding are directly linked to the Debtor's conduct that gave rise to the nondischargeable obligation—i.e., the $200,503.68 Debt—owed by the Debtor to DMM. *Ritz*, 136 S. Ct. at

1589 (holding that "any debts 'traceable to' the fraudulent conveyance . . . will be nondischargeable under § 523(a)(2)(A)"). The link is this: but for the Debtor's false representations and false pretenses, there could be no nondischargeable obligation—i.e. the $200,503.68 Debt—owed by the Debtor to DMM.

Of course, under the so-called "American Rule," each party pays its own attorneys' fees arising out of litigation except when specific authority granted by statute or contract states otherwise. "Since the Bankruptcy Code does not address whether creditors can recover attorney's fees in nondischargeability cases, they can only do so if allowed by another statute or by contract." *Schwertner Backhoe Servs., Inc. v. Kirk (In re Kirk)*, 525 B.R. 325, 330 (Bankr. W.D. Tex. 2015) (footnote omitted). Indeed, the Fifth Circuit has held that creditors can recover attorneys' fees only if there is a contractual or statutory right to fees under state law. *See In re Jordan*, 927 F.2d at 226–27; *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1285–86 (5th Cir. 1992).

2. Application of the Law to the Suit at Bar

In the suit at bar, the Court finds that there is a contractual basis for awarding attorneys' fees to DMM. First, the Guaranty that the Debtor signed promises to pay DMM:

> (a) within two (2) business days after the date Lender notifies Guarantors in the manner herein provided of Borrower(s) failure to pay the Indebtedness at maturity or otherwise and at the place specified in the Note for payment, the full amount of the unpaid Indebtedness and (b) **Lender's reasonable attorneys' fees and all court costs incurred by Lender in enforcing or protecting any of Lender's rights, remedies or recourses under this Guaranty.**

[Pl.'s Ex. No. 2 at 1] (Emphasis added). Second, the Note contains language expressly authorizing the payment of any attorneys' fees and costs incurred by DMM in collecting the amounts due under the Note:

> If this Note is placed in the hands of an attorney for collection, or is collected in whole or in part by suit or through probate, bankruptcy or other legal proceedings of any kind, the Company(s) agrees to pay, in addition to all other sums payable hereunder, all costs and expenses of collection, including but not limited to reasonable attorneys' fees.

[Pl.'s Ex. No. 1 at 2].

Because: (1) the Debtor guaranteed all of the indebtedness made under the Note; (2) the Note provides that Blackwolf must pay DMM's attorneys' fees if DMM has to collect the balance made under the Note through an attorney; (3) the Guaranty provides that the Debtor should pay DMM's attorneys' fees if DMM has to retain an attorney to enforce the Guaranty; and (4) DMM has, in fact, had to retain a law firm to collect the amounts under the Note and enforce the Guaranty, there is no question that the Debtor is contractually liable to DMM for the attorneys' fees, court costs, and expenses that DMM has incurred in the prosecution of this adversary proceeding. Aside from the above-referenced provisions, both the Note and the Guaranty contain provisions expressly setting forth that the laws of the state of Texas govern these two agreements. This is important because section 38.001 of the Texas Civil Practice and Remedies Code expressly sets forth that: "A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." Thus, because: (1) the Debtor personally guaranteed the Note; (2) both the Note and the Guaranty contain provisions allowing for recovery of attorneys' fees; and (3) an express Texas statute provides for the recovery of attorneys' fees for claims under a written contract, this Court concludes that DMM is entitled to its reasonable attorneys' fees for successfully prosecuting this adversary proceeding because there is both a contractual and statutory basis for obtaining such relief.

This Court has the authority to determine just exactly what amount of fees is reasonable. FED. R. BANKR. PROC. 7054(b)(2); see also *Perkins v. Standard Oil Co. of Ca.*, 399 U.S. 222, 223

(1970) (per curiam) (mandating the district court to determine reasonable attorneys' fees for litigation, including various appeals); *Dague v. City of Burlington*, 976 F.2d 801, 804 (2d Cir. 1991) (holding that "determination of a reasonable attorney's fee . . . should normally be decided by the district court in the first instance"). In the suit at bar, counsel for the Debtor has not objected that the amount of fees and expenses requested by DMM—$19,031.79—is reasonable; and therefore, the Debtor has waived any right to object to the reasonableness of this amount.

For its part, the Court has exercised its independent duty to examine the reasonableness of this amount, and the Court finds that the amount is reasonable based upon the record made by DMM's counsel at a hearing held on July 15, 2019. Specifically, this counsel very credibly testified that the total expenses sought by DMM are $1,759.79, almost all of which represents deposition costs made by DMM—an expense which this Court finds to be both necessary and reasonable as part of DMM's prosecution of this adversary proceeding. Counsel also testified that the total attorneys' fees for prosecuting this adversary proceeding were $25,610.50, but that his law firm gave a discount to DMM of $8,338.50—resulting in total attorneys' fees of $17,272.00. The Court has reviewed the fee bills introduced into evidence by DMM's counsel, and finds that these bills comply with U.S. Trustee guidelines and applicable law. Specifically, these fee bills describe in detail the services that were rendered, the date that the services were rendered, the person rendering the service, the hourly rate of the person rendering the service, and the value of the service. The Court finds that all of the services that were rendered were reasonable and necessary at the time that they were rendered. Moreover, there is no question that the services rendered by DMM's counsel resulted in an excellent result for DMM; this Court is entering a judgment that the Debtor owes DMM a nondischargeable amount of $219,535.47. Further, this Court finds that the hourly rates of the two attorneys and one legal assistant who provided services

to DMM were not only very reasonable, but they are below market rate given the experience and competence of these attorneys and legal assistant (See *Mid-Continent Cas. Co. v. Petroleum Sols., Inc.*, No. CV 4:09-0422, 2017 WL 6942658, at *10 (S.D. Tex. Sept. 21, 2017) "Attorneys' fees are to be calculated at the "prevailing market rates in the relevant community"). Specifically, one of the attorneys (Jeremy Masten) has been practicing approximately ten years and has first-chaired three trials, among his litigation experiences; yet, he is only billing out at $200 per hour. Meanwhile, his partner (Walter Cicack), who has been practicing law for approximately thirty-five years and has extensive courtroom experience, is only billing out at $450 per hour. Finally, the legal assistant (Melissa Allen), who has been serving in this capacity for approximately twenty years, is only billing out at $80 per hour. Given these rates and their experience, plus the fact that a discount of almost 33% was given, this Court finds that the amount of $19,031.79 is an eminently reasonable amount for fees and expenses in DMM's prosecution of this suit against the Debtor. *See, e.g., In re Tegeler*, 586 B.R. 598, 707 (2018); *Ritz*, 567 B.R. at 772.[18] As already noted, this amount is nondischargeable pursuant to *Cohen*.

### 3. Post-Judgment Interest on the Total Amount of Attorneys' Fees and Expenses

The Court will also order the Debtor to pay post-judgment interest on the total amount of attorneys' fees and expenses awarded to DMM. The Fifth Circuit has held that interest on attorneys' fees begins to accrue on the date of the judgment allowing recovery of attorneys' fees and runs until the date the fees are paid in full. *See Copper Liquor, Inc. v. Adolph Coors Co.*, 701 F.2d 542, 544–45 (5th Cir. 1983) (en banc), *overruled in part on other grounds by J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193, 1195 (5th Cir. 1986), *aff'd* 482 U.S. 437 (1987).

---

[18] This Court may draw upon its knowledge of the rates charged by other attorneys in the Southern District of Texas whose experience is similar to the background of DMM's two attorneys who prosecuted this adversary proceeding. *See Mid-Continent Cas. Co.*, 2017 WL 6942658, at *10.

Further, if the prevailing party is awarded attorneys' fees and those fees are a part of the judgment, then those fees will bear interest at the same rate as that applied to the judgment on the merits. *Id.* The Fifth Circuit allows this interest on attorneys' fees because it "better serve[s] the purpose of awarding these expenses to the prevailing party since it . . . more nearly compensate[s] the victor for the expenses of the litigation." *Id.* at 544. The post-judgment interest that accrues on the attorneys' fees and expenses is also a nondischargeable obligation. Once again, in making this conclusion, the Court relies upon the language in *Cohen* that the nondischargeable debt imposed upon the Debtor includes "other relief." *Cohen*, 523 U.S. at 223; *see also In re Ayesh*, 465 B.R. at 449–50 (finding legal fees to be nondischargeable); *Wegmans Food Mkts., Inc. v. Lutgen (In re Lutgen)*, No. 98-CV-0764E(SC), 1999 WL 222605, at *3 (W.D.N.Y. Apr. 5, 1999) (same). In the suit at bar, the rate that will be in effect on the date of the entry of the judgment will be 1.97% per annum. *Post-Judgment Interest Rates*, United States District & Bankruptcy Court Southern District of Texas, http://www.txs.uscourts.gov/page/post-judgment-interest-rates (last visited July 19, 2019).

## V. CONCLUSION

The Supreme Court has acknowledged that there is overlap among the subsections of § 523(a), "but that overlap appears inevitable." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1588 (2016). Thus, it is possible that more than one basis under § 523(a) applies to the same set of facts. That is exactly what has happened in the suit at bar. DMM has introduced ample evidence necessary to prove false pretenses and false representations under 11 U.S.C. § 523(a)(2)(A); stated differently, DMM has met its burden by a preponderance of the evidence. The Court makes this conclusion even viewing the facts and evidence in the light most favorable to the Debtor. Indeed, to use the Supreme Court's very apt language, the evidence has shown that the Debtor most

43

definitely is not an "honest but unfortunate debtor" deserving of a discharge of this particular debt. *Grogan*, 498 U.S. at 286.

In sum, the Debtor, through his execution of the Guaranty and his conduct associated with obtaining the loan for Blackwolf, is liable to DMM in the following amounts, all of which constitute nondischargeable obligations: (1) the unpaid principal amount of $150,000.00 owed under the Note; (2) accrued pre-judgment unpaid interest of $50,503.68 owed under the Note as of the date set forth below; (3) attorneys' fees and expenses of $19,031.79; and (4) post-judgment interest of 1.97% per annum (accruing from the date set forth below until all of the above referenced amounts are paid in full).

A judgment consistent with these Findings of Fact and Conclusions of Law will be entered on the docket simultaneously herewith.

Signed on this 19th day of July, 2019.

Jeff Bohm
United States Bankruptcy Judge